IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Roosevelt Guy,                 Case No. 3:14 CV 119

           Plaintiff,         MEMORANDUM OPINION
-vs-                          AND ORDER

Spader Freight Services,         JUDGE JACK ZOUHARY

           Defendant.

Plaintiff *pro se* Roosevelt Guy claims Defendant Spader Freight Services discriminated against him based on his race when it terminated him from his position as a truck driver following his refusal to take a random drug test. This Court held a bench trial on liability on May 1–2, 2018.

### BACKGROUND

This case has a convoluted procedural history. It was originally assigned to Judge David Katz, who dismissed the Complaint under 28 U.S.C. § 1915(e) (Doc. 3). On appeal, the Sixth Circuit affirmed dismissal of the claims under 42 U.S.C. §§ 1981, 1985, and 1986 (Doc. 7 at 3–5), but reversed and remanded for further consideration of the Title VII claim and related damages under 28 U.S.C. § 1981(a) (*id.* at 5–6). On remand, the district court granted in part Spader Freight's Motion to Dismiss the Amended Complaint, which attempted to add a retaliation claim and other allegations beyond the scope of the EEOC charge (Doc. 47). The court also denied Spader Freight's Motion for Summary Judgment on whether the EEOC charge was timely (*id.*). Guy appealed, but the Sixth Circuit dismissed for lack of a final order (Doc. 57).

The case was then reassigned to this Court in July 2016 (Doc. 67). This Court denied Guy's request to further amend the Complaint to add a retaliation claim (Doc. 71) and granted Spader's Motion for Summary Judgment (Docs. 87–88) after concluding that Guy failed to establish a *prima facie* case of discrimination. The Sixth Circuit reversed and remanded for trial (Doc. 93). By agreement of the parties, trial was bifurcated into liability and damages phases (Doc. 100).

In setting the case for trial, this Court appointed the law firm of Widman & Franklin as *pro bono* counsel for Guy. When Guy expressed his preference to represent himself, however, his *pro bono* attorneys remained on the case as stand-by counsel at this Court's request (*see* Docs. 95, 97). Guy chose to utilize his stand-by counsel -- or not -- at various points throughout the remainder of the litigation, as was his right. For example, stand-by counsel served a trial subpoena (Doc. 104) and filed a Motion in Limine (Doc. 114) on Guy's behalf, and Guy consulted with stand-by counsel as he wished during the course of the two-day bench trial. But Guy chose to question witnesses and present argument himself, and he appeared well prepared for trial.

## FINDINGS OF FACT

Guy, an African American, worked at Spader Freight as a truck driver for six years, from 2006 to 2012. He had no disciplinary history and no previous complaints of harassment or discrimination (Tr. Vol. I at 105–06).[1] During this time period, Vice President John Spader supervised the driver work force, which included overseeing hiring and firing decisions (Tr. Vol. I at 101–02). Safety Director Steve Schwiebert was responsible for ensuring compliance with U.S. Department of Transportation (DOT) regulations, which included drug testing, accident reporting, and maintenance issues (Tr. Vol. I at 8).

---

[1] As the trial transcripts have not yet been ordered and filed, citations are to the court reporter's drafts. Page numbers may vary slightly in the final record.

2

The DOT requires regulated motor carriers to randomly drug test a certain percentage of their employees each year. 49 C.F.R. § 382.305. Spader Freight contracts with a third party, HireRight, to administer the drug testing (Tr. Ex. 7). Spader Freight provides the driver names and Social Security numbers to HireRight, and HireRight randomly selects which drivers to test each quarter (*id.*; *see also* Tr. Vol. I at 26). When Guy was first hired, he was provided a copy of the DOT regulations and the Spader Freight employee handbook (Tr. Vol I at 18; *see also* Tr. Ex. 14 at 12–13; Tr. Exs. 16–17). The handbook explains the various types of drug testing required by the DOT (Tr. Ex. 16 at 7). It also explains that refusing to comply with a random drug test is treated the same as a failure, and both are grounds for termination (*id.*).

DOT best practices advise against providing advance notice of selection for random drug screenings (Tr. Vol. I at 16). Once notified, every action the driver takes must lead to a collection, and any conduct that does not directly lead to a collection could be considered a refusal to test (Tr. Vol. I at 15–16). If a driver refuses to immediately submit to a random drug test, the employer is prohibited from allowing the driver to continue performing safety sensitive duties. 49 C.F.R. §§ 382.211, 382.305.

During his six-year employment at Spader Freight, Guy took and passed multiple drug screens, including a pre-employment test and at least one random test (Tr. Vol. I at 10; Tr. Ex. 34 at 1). Guy was selected for a random drug test for third quarter 2012 (Tr. Vol. 1 at 26–27). He was also due for a mandatory DOT physical exam, so Schwiebert scheduled both appointments for the same day and location: September 12, 2012, at Toledo OccuHealth (Tr. Vol. I at 28–29; Tr. Ex. 7). Schwiebert's usual practice was to personally notify employees that they were selected for a random drug screen on the day of the test (Tr. Vol. I at 13–14). But because Guy was already scheduled to

report to OccuHealth for his physical exam, Schwiebert instructed the clinic to inform Guy about the drug test upon arrival (Tr. Vol. I at 28–30).

The parties dispute exactly what happened when Guy arrived at OccuHealth on September 12. Neither Guy nor Betsy Jurvus, the OccuHealth employee who spoke with him at the clinic, testified at trial.[2] But Guy called Schwiebert at around 3 PM, after he left the clinic. Schwiebert was in a staff meeting at the time, and he stepped out to speak with Guy (Tr. Vol. I at 104).[3] Guy told Schwiebert that the clinic wanted to do a drug screen, and Schwiebert confirmed that Guy had been randomly selected to test (Tr. Vol. I at 33–34). Guy responded that he was "not prepared" (Tr. Vol. I at 34). Schwiebert tried to ask what Guy meant by that, but Guy hung up the phone (Tr. Vol. I at 34). At some point during the conversation, which lasted about a minute, Schwiebert told Guy advance notice of a random drug test was not required (Tr. Vol. I at 35–36). Schwiebert also told Guy not to report for work that day (Tr. Vol. I at 37).

Guy's version of events is less clear, in part because he did not testify at trial. This Court asked Guy several times if he was sure he did not wish to testify (Tr. Vol. I at 119–20), and in fact adjourned early on the first day of trial to give him an opportunity to think about it and consult with his stand-by counsel. When the trial resumed the next day, Guy confirmed he did not wish to take the stand (Tr. Vol. II at 4). Nevertheless, Guy concedes that the clinic informed him of the drug test when he arrived (Tr. Vol. II at 29). He also concedes that he did not take a drug test that day (Tr.

---

[2] Jurvus was on medical leave due to terminal cancer at the time of trial (Doc. 116 at 3; Tr. Vol. II at 66). Bill Dawn, the supervising charge nurse, authenticated various documents prepared by OccuHealth, but he did not observe the conversation between Jurvus and Guy (Tr. Vol. II at 66, 73–74).

[3] The record is unclear how many times Schwiebert attempted to call Guy, or who initiated the call when they eventually connected (*see* Tr. Vol. I at 30–35; Tr. Vol II at 14–15, 17; Tr. Ex. 6). The answers to those questions are ultimately irrelevant.

4

Vol. II at 29). But he argues that he "felt like something was going on," that he was "either being discriminated against or OccuHealth had it wrong," because in the past he had always received notice of his selection for a drug screen by a Spader Freight official (Tr. Vol. II at 30). Regardless of Guy's suspicions, Schwiebert's testimony about what happened next is credible and unrefuted. This Court finds that Guy received notice of the drug test twice: first, by clinic staff upon arrival at OccuHealth, and second, by Schwiebert during their phone conversation.

Five days later, Spader Freight sent Guy a letter informing him that, due to his refusal to test, he was prohibited from performing any DOT safety-sensitive duties until he completed a substance abuse evaluation (Tr. Ex. 23). Based on its policy, Spader Freight considered this a termination letter (Tr. Vol. I at 55–56). Following his termination, Guy complained to the Ohio DOT that he had not been properly notified of the random drug test. An Ohio DOT representative contacted Schwiebert and questioned whether the notification was proper because it was initially provided by the clinic, rather than Spader Freight. The Ohio DOT representative recommended that Spader Freight rescind the refusal-to-test determination based on miscommunication, and Schwiebert did so by letter later the same month (Tr. Ex. 3).

At trial, Schwiebert explained that the term "miscommunication" referred to the fact that OccuHealth lacked the authority to tell Guy that his actions constituted a refusal to test -- that determination was up to Spader Freight (Tr. Vol. I at 53–55). This explanation contradicts Schwiebert's previous sworn statement. In an August 2013 declaration, Schwiebert attested that he wrote the letter to appease the Ohio DOT representative, who believed it was improper for OccuHealth to be notified of Guy's selection for a random drug test before Guy was (Doc. 75-3 at 4–5). Regardless of the reason for the letter, Spader Freight still maintains that Guy's failure to submit to a drug screen violated company policy and DOT regulations, and was the basis for his termination.

5

At the time he was terminated, Guy was working at Toledo Mold and Die (TMD) as a shuttle driver, transporting instrument panels to the Chrysler plant. TMD (and by extension, Spader Freight) could be fined $1,000 per minute if Chrysler was forced to shut down due to lack of materials (Tr. Vol. I at 109). Guy was scheduled to begin work at 4:30 PM on September 12, which meant that Spader Freight had little more than an hour to find a replacement driver to cover his shift (Tr. Vol. I at 37, 108). There were five or six qualified drivers operating close enough to Toledo who could make it to TMD in time (Tr. Vol. I at 108–09). John Spader selected Terry Gabriel[4] to cover Guy's shift (Tr. Vol. I at 109). At the time, Gabriel was an "over-the-road" driver who handled week-long assignments (Tr. Vol. I at 52–53, 68–69). Gabriel continued to work at TMD "intermittently" for several weeks after Guy was terminated (Tr. Vol. I at 68).

There was conflicting testimony as to whether Gabriel permanently replaced Guy. John Spader, who was responsible for making that decision, initially testified that he could not recall who replaced Guy (Tr. Vol. I at 97). He later denied that Gabriel was a permanent replacement (Tr. Vol. I at 110). But Scott Sabroske, another Spader Freight driver assigned to TMD, testified that Gabriel eventually stayed on "full-time" as the third member of the TMD shuttle team (Tr. Vol. I at 68–69). Though Sabroske was not responsible for making personnel decisions (Tr. Vol. I at 72), he was certainly in a position to observe who showed up to work with him each day. Further, Spader Freight conceded in its Answer (Doc. 54 at 4) and responses to Plaintiff's Request to Admit (Tr. Ex. 11 at 2) that "it transferred an employee to [Guy's] work location following [Guy's] termination, and that employee happened to be white."

---

[4] Neither side presented any evidence of Gabriel's race, but defense counsel appears to stipulate that he is white (Tr. Vol. II at 18).

6

Spader Freight has terminated other, non-protected employees for issues related to mandatory drug testing. For example, between 2008 and 2013, at least three white drivers were terminated for failing random DOT drug screens (Tr. Vol. II at 42–46; Tr. Exs. 34–36). And in 2017, a white forklift operator was terminated for refusing to submit to a reasonable-suspicion test (Tr. Vol. II at 46–47; Tr. Ex. 33). Although DOT regulations provide for reasonable-suspicion tests, this individual was not a regulated employee because he drove a forklift, not a truck. Nevertheless, Spader Freight exercised its discretion and required him to complete a drug screen when he was observed staggering at work (Tr. Vol. II at 47). Schwiebert transported the employee to the clinic to complete the test, but he refused to do so and was terminated the next day (Tr. Vol. II at 47–48). Schwiebert personally notified all four of these individuals that they were required to submit to a drug test before they reported to the clinic.

Spader Freight has also allowed at least one non-protected employee to submit to a delayed drug screen -- that is, a drug test that did not take place on the same day the employee was notified. Sabroske, who is white, was involved in a workplace accident at TMD, and TMD requested a post-accident drug screen (Tr. Vol. I at 70). Sabroske was willing to comply and reported to a hospital emergency room to submit to the test. But he did not actually test that day because TMD lacked authority to order the drug screen (Tr. Vol. I at 73–74). Instead, Spader Freight arranged for him to test the following day, which he did (Tr. Vol. I at 70–71).

## CONCLUSIONS OF LAW

In discrimination cases based on circumstantial evidence, courts apply the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. The burden then shifts to the defendant to identify a legitimate, non-discriminatory reason for its action.

Finally, the burden swings back to the plaintiff to show that the defendant's proffered explanation is pretextual. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000).

**The *Prima Facie* Case**

To establish a *prima facie* case of race discrimination under Title VII, Guy must show (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he suffered an adverse employment action, and (4) he was replaced by a non-protected employee or treated less favorably than similarly situated, non-protected employees. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992). In light of the Sixth Circuit decision remanding the case, Spader Freight does not contest the first three elements (Doc. 116 at 2; Doc. 117). At trial, Guy argued both (1) that he was replaced by a white employee, and (2) that he was treated less favorably than similarly situated white employees, who all received notice of their random drug tests directly from Spader Freight.

On the first point, this Court concludes Guy was replaced by a white employee. A terminated employee "is not replaced when another employee is assigned to perform [his] duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the [terminated employee's] duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (internal quotation marks omitted). Spader Freight did not hire a new employee to replace Guy, but it did reassign Gabriel to cover his shifts for at least some period of time. And whether or not Gabriel was a permanent replacement, Spader Freight acknowledges it transferred a white employee to fill the position.

As for the second argument, this Court concludes Guy was not treated less favorably than similarly situated employees. To draw a comparison with other, non-protected employees, Guy "must

8

show that the 'comparables' are similarly-situated *in all respects*." *Mitchell*, 964 F.2d at 583 (emphasis in original). *See also id.* ("[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."). Sabroske and the forklift driver are not similarly situated because they were not selected for a random DOT drug test; instead, they were asked to submit to a post-accident test and reasonable-suspicion screen, respectively.

The other three drivers could be considered similarly situated, at least to the extent that they were all randomly selected for a DOT drug test. Guy argues they received more favorable treatment because they received notification of the drug test directly from Spader Freight. He contends Spader Freight was not permitted to delegate notification duties to a third party, and at a minimum, Schwiebert violated company policy by doing so. DOT regulations require an employer to notify an employee when he or she has been selected for a mandatory DOT drug test. 49 C.F.R. § 382.113. But they are silent on whether the employer may delegate that responsibility to a third-party service agent. *Cf.* 49 C.F.R. § 382.305(j)(2) ("As an employer, you may use a service agent (*e.g.* a C/TPA) to perform random selections for you"). The DOT "best practices" guidelines provide only that notification should be accomplished "discreetly . . . according to your company's policy" (Tr. Ex. 42). And Guy is correct that Spader Freight's policy, as summarized in the employee handbook, was for "a company official" to notify a driver of a random drug or alcohol test (Tr. Ex. 17 at 58).

But despite all this, Guy was not treated less favorably than other employees because he did in fact receive notice -- twice. OccuHealth staff first informed Guy that he was required to take a drug test when he arrived at the clinic for his physical. Even assuming that Guy was confused or

9

disbelieved them, he spoke with Schwiebert soon after, who confirmed that Guy was randomly selected for a drug test. Thus, Guy did receive notice from "a company official," and yet he still refused to submit to the test.

**The Legitimate, Non-Discriminatory Reason**

Because Guy established a *prima facie* case based on his replacement by a white employee, the burden shifts to Spader Freight to identify a legitimate, non-discriminatory reason for his termination. Spader Freight maintains Guy was terminated based on company policy because he refused to take a random DOT drug test.[5] A refusal to test is treated the same as a failure, and Spader Freight has terminated other white employees for both refusing and failing drug tests, consistent with its policy.

**The Evidence of Pretext**

The burden therefore swings back to Guy to prove that this reason is mere pretext for discriminatory animus. Guy may demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the decision, or (3) was insufficient to warrant the decision. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 720 (6th Cir. 2006).

Guy argues that Schwiebert's letter describing the refusal-to-test determination as a "miss communication [sic]" calls into question Spader Freight's basis for terminating him. At trial, Schwiebert tried to qualify what he meant by "miscommunication." But whether or not this Court finds his explanation credible, the fact remains that Guy did indeed refuse to submit to a drug test. Moreover, Guy worked at Spader Freight for six years without incident, and the same individual

---

[5] Spader Freight introduced a variety of medical records at trial, which it contends establish a motivation for Guy to avoid taking a drug test (Tr. Vol. II at 26–31). This Court does not rely on those records in reaching this decision.

10

(John Spader) approved both his hiring and firing. *See Garrett v. Sw. Med. Clinic*, 631 F. App'x 351, 357 (6th Cir. 2015) ("[A] presumption can arise that an employee's race did not motivate the termination because the sort of person would discriminate against a particular race would not also hire someone of that race."); *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995) (describing the "same actor" inference). In short, while Guy has identified some inconsistencies in the details of Spader Freight's explanation, he points to no indicia of racial animus to undermine the stated reason for his termination. *See Grizzell*, 461 F.3d at 721 ("Completely lacking from the extensive record before us is any evidence that Jackson, in deciding when to promote candidates, placed any weight on race.")

## CONCLUSION

By all accounts, Roosevelt Guy was a model employee during his six-year tenure at Spader Freight. He had no disciplinary history, he was entrusted with an important assignment, and he was respected by his co-workers. Unfortunately, even otherwise good employees sometimes (intentionally or not) violate company policies, and it is within an employer's rights to enforce its policies. This is especially so here, where those policies were governed by DOT regulations intended to promote the safety of both drivers and the public. This Court rules in favor of Spader Freight on liability. Based on this ruling, there is no need to proceed to trial on the issue of damages.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

June 19, 2018